No. 22-3573

---

## In the United States Court of Appeals for the Sixth Circuit

---

Mark Changizi, et al.,
*Plaintiffs-Appellants,*

v.

Department of Health and Human Services, et. al.,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Southern District of Ohio
The Honorable Edmund A. Sargus, Jr.
Case No. 2:22-cv-1776

---

## Brief of Amicus Curiae Professor Eugene Volokh in Support of Neither Party

---

December 3, 2022

Eugene Volokh*
First Amendment Amicus Brief Clinic
UCLA School of Law
385 Charles E. Young Dr. E
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

* Counsel would like to thank Asim Zaidi, Ian Levy, and Jonathan Kaiman, UCLA School of Law students who worked on the brief.

# TABLE OF CONTENTS

Table of Contents ........................................................................ 1

Table of Authorities .................................................................... 2

Interest of *Amicus Curiae* ......................................................... 4

Summary of Argument ................................................................ 5

Argument .................................................................................... 7

    I.   The employer coercion cases provide useful precedent that is compatible with the government coercion cases ..................... 7

    II.  The employer coercion cases make clear that coercion can be present even if the speaker lacks direct authority over the listeners ............................................................................. 10

    III. The employer coercion cases protect noncoercive employer speech, just as noncoercive government speech should remain allowed ....................................................................... 14

Conclusion .................................................................................. 17

Certificate of Compliance .......................................................... 19

Certificate of Service ................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Bantam Books, Inc. v. Sullivan,* 372 U.S. 58 (1963) ........................... 8, 17

*Blaylock Elec. v. NLRB*, 121 F.3d 1230 (9th Cir. 1997) ............. 11, 12, 13

*CNP Mechanical, Inc. v. NLRB*, 269 F. App'x 25 (2d Cir. 2008) .................................................................................... 11, 12, 13

*General Elec. Co. v. NLRB*, 117 F.3d 627 (D.C. Cir. 1997) .................... 16

*Hendrickson USA, LLC v. NLRB*, 932 F.3d 465 (6th Cir. 2019) ................................................................................. 5, 8, 9, 10

*Indiana Cal-Pro, Inc. v. NLRB*, 863 F.2d 1292 (6th Cir. 1988) ................................................................................................ 16

*Kinney Drugs, Inc. v. NLRB*, 74 F.3d 1419 (2d Cir. 1996) .................... 15

*NLRB v. E.I. DuPont de Nemours*, 750 F.2d 524 (6th Cir. 1984) .................................................................................................. 9

*NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575 (1969) ............. 5, 6, 7, 16

*NLRB v. Norbar, Inc.*, 752 F.2d 235 (6th Cir. 1985) ................................ 9

*NLRB v. Okun Bros. Shoe Store*, 825 F.2d 102 (6th Cir. 1987) ..................................................................................... *passim*

*Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) ........................ 8, 13, 14

*R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir. 1984) .......................................................................................... 15

*Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991) ...................................... 8

*Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899 (6th Cir. 1997) ................................................................................................. 5

*Webco Indus., Inc. v. NLRB*, 217 F.3d 1306 (10th Cir. 2000) ................................................................................................10

*Zieper v. Metzinger*, 474 F. 3d 60 (2d Cir. 2007) .......................................9

**Other Authorities**

Cameron F. Kerry, *Section 230 Reform Deserves Careful and Focused Consideration*, Brookings Institution (May 14, 2021) ................................................................................12

Hearing Before the United States Senate Committee on the Judiciary, Testimony of Mark Zuckerberg, Facebook, Inc. (Nov. 17, 2020) ...........................................................................12

Sara Morrison & Shirin Ghaffary, *The Case Against Big Tech*, Vox (Dec. 8, 2021)...........................................................12

## INTEREST OF *AMICUS CURIAE*[1]

Eugene Volokh is the Gary T. Schwartz Distinguished Professor of Law at UCLA School of Law. He is the author of over 50 law review articles on First Amendment law, and the casebook *The First Amendment and Related Statutes* (7th ed. 2020). He has studied the employer coercive speech cases in the course of his research on free speech in the workplace, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. Rev. 1791 (1992), as well as on the "speech integral to criminal conduct" exception, *The "Speech Integral to Criminal Conduct" Exception*, 101 Cornell L. Rev. 981 (2016). He has also written briefly on the government coercive speech cases and the employer coercive speech cases, at *Government Persuasion vs. Government Coercion: The Employer Speech Analogy*, Volokh Conspiracy (Reason), July 19, 2021, 8:10 pm, https://reason.com/volokh/2021/07/19/government-persuasion-vs-government-coercion-the-employer-speech-analogy/, and *When Government Urges Private Entities to Restrict*

---

[1] No party or party's counsel has authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief. No person has contributed money that was intended to fund preparing or submitting the brief, except that UCLA School of Law paid the expenses involved in filing this brief.

All parties have consented to the filing of this *amicus* brief.

*Others' Speech*, Volokh Conspiracy (Reason), July 19, 2021, 6:20 pm, https://reason.com/volokh/2021/07/19/when-government-urges-private-entities-to-restrict-others-speech/.

## SUMMARY OF ARGUMENT

In considering whether the government has coerced private entities into restricting speech (whether their own speech or others' speech), this Court should consider by analogy its precedent concerning when employers are liable for coercing their employees. *See, e.g., Hendrickson USA, LLC v. NLRB*, 932 F.3d 465 (6th Cir. 2019); *Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899 (6th Cir. 1997); *NLRB v. Okun Bros. Shoe Store*, 825 F.2d 102 (6th Cir. 1987).

These employer coercion cases, together with the Supreme Court's 1969 decision in *NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969), are consistent with other courts' decisions in cases where the government is the alleged coercer, but can also offer helpful guideposts that supplement those decisions. In particular, they discuss the significance of threats made by sources that lack a direct ability to act on threats, which may be relevant to this case: Even government agencies—such as HHS—with little or no regulatory authority over social media platforms may still

speak coercively if the platforms reasonably believe the agencies are privy to the enforcement plans of *other* government actors who *do* have that authority. *Cf. Okun Bros. Shoe Store*, 825 F.2d at 105 (finding coercion where employees "surely could have believed . . . [an assistant store manager] would be privy to management plans").

At the same time, the employer coercion cases correctly protect a broad range of nonthreatening employer speech, just as the government coercion cases correctly protect a similarly broad range of government speech. For example, while the employer coercion cases forbid employers from threatening company closure in response to union organizing, they do allow employers to make "reasonable prediction[s]" about adverse consequences of organizing that are outside of the employers' control. *Gissel*, 395 U.S. at 618. The employer coercion cases thus offer helpful guideposts that can protect the government's (or employers') right to speak in a noncoercive manner, but forbid the use of such speech to coercively deter regulated parties' (or employees') right to speak or to host speech.

This brief discusses only the law relevant to plaintiffs' coercion theory, Appellants' Br. at 3, 16, 38-41; it expresses no opinion on plaintiffs' other

arguments (such as the "[j]oint [p]articipation and [g]overnment [e]ntwinement" argument, *id.* at 41).

## ARGUMENT

### I.   The employer coercion cases provide useful precedent that is compatible with the government coercion cases

The employer coercion cases provide precedents that can help determine when expression crosses the line into subtle coercion.

In the leading Supreme Court case on the subject, an employer threatened to retaliate if employees unionized, by stating that unionization would cause the plant to close. *Gissel*, 395 U.S. at 619. The court found that such speech violated labor law, because it was unduly coercive, and that the speech was therefore not protected by the First Amendment. The analysis, the Court stressed, "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Id.*

This reasoning equally applies when the government speaks to businesses that are potentially subject to government regulation. Businesses'

regulatory, and thus economic, dependence on the government is similar to employees' regulatory dependence on their employers.

Unsurprisingly, this Court's and other courts' analyses in similar employer coercion cases have been compatible with other courts' analyses in government coercion cases. The government coercion cases generally consider four related factors to determine whether government speech "could reasonably be interpreted as an implied threat." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003):

1.  the defendants' regulatory or other decisionmaking authority over the targeted entities;

2.  whether the government actors actually exercised that authority over targeted entities;

3.  whether the language of the allegedly threatening statements could reasonably be perceived as a threat; and

4.  whether any of the targeted entities perceived an implicit threat.

*Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 68-69 (1963); *Rattner v. Netburn*, 930 F.2d 204 (2d Cir. 1991); *Okwedy*, 333 F.3d at 343. The employer coercion cases likewise consider these factors. *See, e.g.*, *Okun Bros. Shoe Store*, 825 F.2d at 106-09; *Hendrickson*, 932 F.3d at 472.

And the test in the employer coercion cases, like the test in the government coercion cases, is contextual, asking "whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights," and considering "the total context in which the challenged conduct occurs and is justified in viewing the issue from the standpoint of its impact upon the employees." *Okun Bros. Shoe Store*, 825 F.2d at 105 (citing *NLRB v. Norbar, Inc.*, 752 F.2d 235, 238 (6th Cir. 1985), and *NLRB v. E.I. DuPont de Nemours*, 750 F.2d 524, 528 (6th Cir. 1984)); *compare Zieper v. Metzinger*, 474 F. 3d 60, 66 (2d Cir. 2007) (considering, in a government coercion context, "the entirety of the defendants' words and actions in determining whether they could reasonably be interpreted as an implied threat").

Thus, for instance, in *Hendrickson*, this Court stressed that whether a statement is threatening and thus coercive must be viewed in "the context of other statements or actions by the employer," including "whether the context of the statement includes contemporaneous threats or unfair labor practices." *Hendrickson*, 932 F.3d at 472. In *Hendrickson*, the employer sent a plant-wide letter cautioning employees that contract negotiations would be "bargaining from scratch" if a union were to form. *Id.*

9

at 468. Absent a "context of . . . contemporaneous threats or unfair labor practices," this Court held, this phrase was not reasonably perceived as coercive. *Id*. at 473.

But in *Webco Indus., Inc. v. NLRB*, 217 F.3d 1306, 1317 (10th Cir. 2000), the court held that management's statement that it would bargain from "ground zero" was reasonably perceived as coercive, because in that case, the statement was made in the context of management having unfairly disciplined employees for union solicitation. At that point, "the statement exceed[ed] an expression of opinion as to the natural and normal hazards of collective bargaining and 'carrie[d] with it the seed of a threat that the employer will become punitively intransigent in the event the union wins the election,'" which made it "coercive and unlawful." *Id*. (citation omitted).

## II. The employer coercion cases make clear that coercion can be present even if the speaker lacks direct authority over the listeners

The employer coercion cases also properly reflect that an employer's agents are all working for the employer, and may thus effectively threaten employer retaliation even if they themselves have no direct control

over their listeners. Thus, in *Okun Bros. Shoe Store*, an assistant manager made a statement to employees that hours might be cut if a union formed. 825 F.2d at 106. The court held that employees could have reasonably perceived this as a threat because, while the employees might not have actually believed that the assistant manager could cut hours, he might still "be privy to management plans." *Id.*

Other circuits have similarly attributed lower managerial staff's behavior to an employer where "'under all circumstances' a prospective employee 'would reasonably believe that [the staffer] was speaking for management and reflecting company policy.'" *CNP Mechanical, Inc. v. NLRB*, 269 F. App'x 25, 29 (2d Cir. 2008) (finding anti-union statements by an administrative assistant were attributable to an employer). Even speech by a receptionist "who responded to inquiries about . . . job openings" could be coercive if, "under all the circumstances, an employee would reasonably believe that the [receptionist] was speaking for management and reflecting company policy." *Blaylock Elec. v. NLRB*, 121 F.3d 1230, 1234 (9th Cir. 1997) (cleaned up).

In this case, the District Court found there was no coercion because the Department of Health and Human Services lacked regulatory authority over Twitter. (Opinion and Order, RE 37, PageID ## 394-395.) But HHS is a cabinet-level executive branch department in regular communication with President Biden; and a President of course has great influence over a Congress that is under the control of his own party (as Congress was at the time of the statements relevant to this case). Congress in turn had the power to, among other things, revoke social media platforms' Section 230 immunity,[2] enhance antitrust restrictions,[3] and subject CEOs to lengthy, nationally televised interrogations.[4] HHS may well be at least as "privy to" the President's and his party's "plans" as the assistant manager in *Okun Bros. Shoe Store*; and it can certainly be seen as "speaking for management," *i.e.*, for the President, and "reflecting [Administration] policy," as in *CNP Mechanical* and *Blaylock Electric*.

---

[2] *See* Cameron F. Kerry, *Section 230 Reform Deserves Careful and Focused Consideration*, Brookings Institution (May 14, 2021), https://perma.cc/SX33-9BHN.

[3] *See* Sara Morrison & Shirin Ghaffary, *The Case Against Big Tech*, Vox (Dec. 8, 2021), https://perma.cc/66HD-E5C9.

[4] *See, e.g.,* Hearing Before the United States Senate Committee on the Judiciary, Testimony of Mark Zuckerberg, Facebook, Inc. (Nov. 17, 2020), https://perma.cc/U86G-YXMX.

Likewise, HHS made several requests of social media companies, including that they provide HHS with data concerning "sources of COVID-19 misinformation" and take action to stop misinformation "super spreaders." (Opinion and Order, RE 37, PageID # 378.) HHS did not have the power to enforce these requests or sanction Twitter for noncompliance. *Id.* at 33-34. But *Okun Bros. Shoe Store*, *CNP Mechanical*, and *Blaylock Electric* suggest that Twitter could have reasonably worried that HHS was conveying the President's policies, and that the President would in turn retaliate against Twitter if it did not go along with HHS's implicit demands. Such perceptions would have been supported by the joint conference held by HHS and Press Secretary Psaki, an agent of the a government actor *with* direct decisionmaking authority—President Biden; at that conference, Psaki "note[d] that the Biden Administration [was] 'working to take' various actions in response to the spread of COVID-19 misinformation, including" "[p]roposing various 'changes . . . to social media platforms.'" *Id.* at 10.

And at least one out-of-circuit government coercion case, *Okwedy v. Molinari*, has adopted reasoning similar to that in the employer coercion cases. In *Okwedy*, a city borough president wrote to a billboard company,

13

criticizing billboards that displayed a religious organization's signs proclaiming homosexuality to be a sin. 333 F.3d at 341. The company then removed the billboards, and the religious organization sued the president for violating its free speech rights. *Id.* at 342.

Though the president did not have direct regulatory authority over the billboard company, the court still found that his speech could have been coercive: Even in the absence of direct authority, the company "could reasonably have feared that [the president] would use whatever authority he does have" to interfere with the company. *Id.* at 344. "[T]he fact that a public-official defendant lacks direct regulatory or decisionmaking authority over a plaintiff, or a third party that is publishing or otherwise disseminating the plaintiff's message, is not necessarily dispositive" of whether the public official's speech was coercive. *Okwedy*, 333 F.3d at 343.

## III. The employer coercion cases protect noncoercive employer speech, just as noncoercive government speech should remain allowed

The employer coercion cases are also helpful because they recognize that the law must protect the freedom of both employers and employees.

14

Employers must retain the right to speak when their speech is not coercive. "Granting an employer the opportunity to communicate with its employees does more than affirm its right to freedom of speech; it also aids the workers by allowing them to make informed decisions." *Kinney Drugs, Inc. v. NLRB*, 74 F.3d 1419, 1428 (2d Cir. 1996). But employees' ability to exercise their rights to associate and advocate must also be protected against coercion.

The same logic applies to government speech. The law should not suppress the government's rights to non-coercively convey its messages, but also should not allow the government to coerce people into remaining silent, or into silencing their users. *See R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 88-89 (3d Cir. 1984) (concluding that government encouragement is permissible, but government threats are not).

The employer coercion cases try to protect both sides' rights by distinguishing employer "threat[s] of retaliation" (which are viewed as coercive, and unprotected by the First Amendment) from "reasonable prediction[s]" (which are protected by the First Amendment). "If there is any implication that an employer may . . . take action solely on his own initiative . . .

the statement is no longer a reasonable prediction based on available facts, but a threat of retaliation." *Gissel*, 395 U.S. at 618.

For instance, an employer's statement that unionization will lead to the shutting down a plant fails the reasonable prediction test where "no objective evidence was presented . . . that unionization would result or even could result in an objectively required economic closing of the plant." *See Indiana Cal-Pro, Inc. v. NLRB*, 863 F.2d 1292, 1298-99 (6th Cir. 1988). Conversely, a general manager's statement that collective bargaining would eliminate various beneficial pay practices was found to be a reasonable prediction where the facts indicated that the agreement would "automatically" result in such losses. *General Elec. Co. v. NLRB*, 117 F.3d 627, 632 (D.C. Cir. 1997).

This approach may also be useful as to government speech. For instance, when the government merely "reasonabl[y] predict[s]" that certain private speech could cause public harm, and that platforms should therefore block such speech, it would not be viewed as impermissibly coercive. But speech that conveys "any implication that" the government "may . . . take action solely on [its] own initiative" based on the speech—such as instituting new regulations, or otherwise retaliating against the

16

platforms—would be coercive and would violate the First Amendment rights of the platforms' users, much as the speech in *Bantam Books,* 372 U.S. at 70-71, violated the rights of book publishers.

## CONCLUSION

The coercive employer speech cases provide additional guidance for assessing whether speech—by employers or by the government—is unduly coercive. These cases, including cases from this Court, are also compatible with the out-of-circuit cases that have more directly addressed the coercive government speech cases. Here, the coercive employer speech cases counsel in favor of recognizing that

1. Twitter's economic dependence on regulators may create a coercive effect;

2. this effect may be present even with regard to government speech from entities that have no *direct* regulatory authority over Twitter (such as HHS); but

3. the effect should be viewed as coercive only if the speech conveys "any implication that" the government "may . . . take action

17

solely on his own initiative" based on the speech, rather than being just a "reasonabl[e] predict[ion]" of harm that could be caused if Twitter allows certain speech to be distributed on its site.

Respectfully Submitted,

s/ Eugene Volokh

*Pro se*
First Amendment Amicus Brief Clinic
UCLA School of Law
385 Charles E. Young Dr. E
Los Angeles, CA 90095
(310) 206-3926
volokh@law.ucla.edu

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 2,684 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365 Word in 14-point Century Schoolbook.

Dated: December 3, 2022

s/ Eugene Volokh
*Pro se*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief *Amicus Curiae* with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on __.

All participants in the case are registered CM/ECF users, and will be served by the appellate CM/ECF system.

Dated: December 3, 2022

s/ <u>Eugene Volokh</u>
*Pro se*