No. 22-3573

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

————————————

MARK CHANGIZI, MICHAEL P. SENGER, and DANIEL KOTZIN,

Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; VIVEK
MURTHY, in his official capacity as U.S. Surgeon General; and XAVIER BECERRA,
in his official capacity as Secretary of Health and Human Services,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the Southern District of Ohio

————————————

**BRIEF FOR APPELLEES**

————————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

KENNETH L. PARKER
*United States Attorney*

DANIEL TENNY
DANIEL WINIK
*Attorneys, Appellate Staff
Civil Division, Room 7245
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 305-8849*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................ii

STATEMENT REGARDING ORAL ARGUMENT ....................................vii

STATEMENT OF JURISDICTION..................................................................1

STATEMENT OF THE ISSUE ..........................................................................1

STATEMENT OF THE CASE ...........................................................................1

    A.    Factual Background ........................................................................1

    B.    This Action ........................................................................................6

SUMMARY OF ARGUMENT ........................................................................ 12

STANDARD OF REVIEW............................................................................... 14

ARGUMENT .................................................................................................... 15

I.    There Is No Concrete Case Or Controversy Between Plaintiffs And Defendants.................................................................................................. 15

II.    The Complaint Fails To State A Claim On The Merits....................... 25

    A.    Plaintiffs' First Amendment Claim Is Meritless.......................26

    B.    Plaintiffs' Other Claims Are Equally Meritless ..........................36

CONCLUSION ................................................................................................. 39

CERTIFICATE OF COMPLIANCE

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

# TABLE OF AUTHORITIES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................7, 19, 20

*Association of American Physicians & Surgeons, Inc. v. Schiff,*
  23 F.4th 1028 (D.C. Cir. 2022) ...................................................... 17, 18

*Backpage.com, LLC v. Dart,*
  807 F.3d 229 (7th Cir. 2015) ................................................................28

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1963) ...........................................................................27, 28

*Batterton v. Marshall,*
  648 F.2d 694 (D.C. Cir. 1980) ............................................................36

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ...............................................................................19

*Bennett v. Spear,*
  520 U.S. 154 (1997) ...............................................................................16

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) .................................... 10-11, 13, 14, 26, 27, 29, 30, 31, 33, 34

*Bowen v. Georgetown University Hospital,*
  488 U.S. 204 (1988) ...............................................................................36

*Brentwood Academy v. Tennessee Secondary School Athletic Association,*
  531 U.S. 288 (2001) ........................................................................26, 34

*California Communities Against Toxics v. EPA,*
  934 F.3d 627 (D.C. Cir. 2019) ............................................................38

*Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.,*
  827 F.2d 1291 (9th Cir. 1987) ............................................................29

*CFTC v. Monex Credit Co.,*
  931 F.3d 966 (9th Cir. 2019) ..............................................................19

*Changizi v. HHS*,
    __ F. Supp. 3d __, 2022 WL 1423176 (S.D. Ohio May 5, 2022) .............. 9, 10, 11, 18,
                                                             19, 21, 24, 25

*Crawford v. U.S. Department of the Treasury*,
    868 F.3d 438 (6th Cir. 2017) ............................................................................16

*Devereux v. Knox County*,
    15 F.4th 388 (6th Cir. 2021) ............................................................................15

*Fair Finance Co., In re*,
    834 F.3d 651 (6th Cir. 2016) ...............................................................2, 21, 33

*Ferro Corp. Derivative Litigation, In re*,
    511 F.3d 611 (6th Cir. 2008) ............................................................................11

*Florida v. Becerra*,
    544 F. Supp. 3d 1241 (M.D. Fla. 2021) ..........................................................36

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
    561 U.S. 477 (2010) .........................................................................................24

*Glennborough Homeowners Association v. U.S. Postal Service*,
    21 F.4th 410 (6th Cir. 2021) ............................................................................16

*Howard v. City of Detroit*,
    40 F.4th 417 (6th Cir. 2022) ............................................................................21

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982) .........................................................................................34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................... 15, 24

*Mathis v. Pacific Gas & Electric Co.*,
    891 F.2d 1429 (9th Cir. 1989) .........................................................................34

*National Association of Letter Carriers v. U.S. Postal Service*,
    604 F. Supp. 2d 665 (S.D.N.Y. 2009) .............................................................37

*Okwedy v. Molinari,*
   333 F.3d 339 (2d Cir. 2003) .................................................................... 28, 29

*Omnicare, Inc. Securities Litigation, In re,*
   769 F.3d 455 (6th Cir. 2014) ........................................................................23

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) .......................................................................................25

*Parsons v. DOJ,*
   878 F.3d 162 (6th Cir. 2017) ........................................................................38

*Peterson v. City of Greenville,*
   373 U.S. 244 (1963) .......................................................................................29

*Rawson v. Recovery Innovations, Inc.,*
   975 F.3d 742 (9th Cir. 2020) ........................................................................35

*Turaani v. Wray,*
   988 F.3d 313 (6th Cir. 2021) ............................................................12, 15, 16

*United States v. Gurley,*
   384 F.3d 316 (6th Cir. 2004) ........................................................................37

*United States v. Jones,*
   565 U.S. 400 (2012) .......................................................................................39

*United States v. Morton Salt Co.,*
   338 U.S. 632 (1950) .......................................................................................37

*Winget v. JP Morgan Chase Bank, N.A.,*
   537 F.3d 565 (6th Cir. 2008) ........................................................................23

## Statutes:

5 U.S.C. § 704 ......................................................................................................37

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. § 1331 ....................................................................................................1

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ...................................................................................1

Fed. R. App. P. 4(a)(4)(A)(iv) ......................................................................21-22

Fed. R. Evid. 201(b) ..................................................................................22, 23

**Legislative Materials:**

*Radicalization: Social Media and the Rise of Terrorism: Hearing Before the Subcommittee on National Security of the House Committee on Oversight and Government Reform*, 114th Cong. (2015) ...................................................................................2

S. Rep. No. 116-290 (2020) ...........................................................................2

**Other Authorities:**

*Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*, https://perma.cc/KMU4-Q3RB.....................4, 5, 31

Vijaya Gadde & Matt Derella, Twitter, *An Update on Our Continuity Strategy During COVID-19*, (Mar. 16, 2020, updated Apr. 1, 2020), https://perma.cc/RA9S-H296 ....................................................................... 2, 3

*Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information (RFI)*, 87 Fed. Reg. 12,712 (Mar. 7, 2022)..........................................................6, 31, 37

*Press Briefing by Press Secretary Jen Psaki* (July 16, 2021), https://perma.cc/HE54-LB2R ..................................................................... 5, 6

*Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack* (May 5, 2021), https://perma.cc/4ZGE-N9QL .............. 4, 30

*Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy* (July 15, 2021), https://perma.cc/Y3YQ-L8MD.......................5

Yoel Roth & Nick Pickles, Twitter, *Updating Our Approach to Misleading Information* (May 11, 2020), https://perma.cc/LSM4-3AAA ...........................................................3

Twitter, *COVID-19 Misinformation*, https://perma.cc/Y2B9-QCBM ........................ 3, 25

Twitter Safety, *COVID-19: Our Approach to Misleading Vaccine Information*
   (Dec. 16, 2020), https://perma.cc/8FXZ-EC2K .................................................... 3, 16

## STATEMENT REGARDING ORAL ARGUMENT

The government does not believe oral argument is necessary but stands ready to present oral argument if the Court would find argument helpful.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because plaintiffs' claims arise under federal law. The district court's dismissal of this suit on May 5, 2022, was a final judgment, and plaintiffs timely appealed from that judgment on June 30, 2022. Notice of Appeal, RE43, PageID #690; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Plaintiffs claim to have been disciplined by Twitter for making posts that Twitter deemed to violate a policy against misleading information regarding COVID-19. Plaintiffs brought this suit against the U.S. Department of Health and Human Services and two of its senior officials, alleging that they acted unlawfully by encouraging social-media platforms to enforce policies like the one under which plaintiffs were disciplined and by requesting certain information from platforms. The question presented is whether the district court properly dismissed plaintiffs' complaint for lack of jurisdiction and failure to state a claim.

## STATEMENT OF THE CASE

### A.     Factual Background

1.     Social media platforms, including Twitter, allow hundreds of millions of people to share their views instantaneously around the globe. The unprecedented scope and speed of communications through these platforms has afforded many benefits. It has also presented significant hazards, ranging from the recruitment of terrorists to

efforts by foreign states to interfere with U.S. elections. *See, e,g.,* *Radicalization: Social Media and the Rise of Terrorism: Hearing Before the Subcomm. on Nat'l Sec. of the H. Comm. on Oversight and Gov't Reform*, 114th Cong. (2015); S. Rep. No. 116-290 (2020).

Platforms, including Twitter, have long sought to address these problems by maintaining and enforcing content policies. Those efforts intensified with the onset of the COVID-19 pandemic. In March 2020, Twitter "[b]roaden[ed]" the "definition of harm" in its existing content-moderation policies "to address content that goes directly against guidance from authoritative sources of global and local public health information." Vijaya Gadde & Matt Derella, Twitter, *An Update on Our Continuity Strategy During COVID-19* (Mar. 16, 2020, updated Apr. 1, 2020), https://perma.cc/RA9S-H296 (cited in Complaint ¶ 17 & n.5, RE1, PageID #7).[1] Twitter expressed the intention to "enforce" that policy "in close coordination with trusted partners, including public health authorities and governments, and continue to use and consult with information from those sources when reviewing content." *Id.* It explained that it would not "limit good faith discussion" about the pandemic but would "remov[e] content" that "has a clear call to action that could directly pose a risk to people's health or well-being." *Id.* Under that policy, over the span of two weeks, Twitter "removed more than 1,100

---

[1] The Twitter policies and other documents cited in plaintiffs' complaint are properly considered in this appeal from the dismissal of plaintiffs' suit. *See, e.g.,* *In re Fair Finance Co.*, 834 F.3d 651, 656 n.1 (6th Cir. 2016) ("'[W]hen a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment.'").

tweets containing misleading and potentially harmful content" and "challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors." *Id.*

Twitter refined its COVID-19 misinformation policy over the course of the pandemic. In May 2020, for example, Twitter "introduc[ed] new labels and warning messages" to "provide additional context and information on some Tweets containing disputed or misleading information related to COVID-19." Yoel Roth & Nick Pickles, Twitter, *Updating Our Approach to Misleading Information* (May 11, 2020), https://perma.cc/LSM4-3AAA (cited in Complaint ¶ 18 & n.6, RE1, PageID #7). It explained that it would "take action" against "statements or assertions that have been confirmed to be false or misleading by subject-matter experts, such as public health authorities," including by removing such statements from the platform when they had a propensity to cause severe harm. *Id.* And later, as vaccines against COVID-19 became available, Twitter broadened its policy to provide for the removal of a variety of vaccine-related misinformation, such as "[f]alse claims that COVID-19 is not real or not serious, and therefore that vaccinations are unnecessary," Twitter Safety, *COVID-19: Our Approach to Misleading Vaccine Information* (Dec. 16, 2020), https://perma.cc/8FXZ-EC2K (cited in Complaint ¶ 18 & n.6, RE1, PageID #7).

Twitter's website currently states that, as of "November 23, 2022, Twitter is no longer enforcing" its "COVID-19 misleading information policy." Twitter, *COVID-19 Misinformation*, https://perma.cc/Y2B9-QCBM.

- 3 -

2.    This suit arises from various statements and actions by public officials starting in 2021.  The federal government and its officials have shared the platforms' concerns about the potential harms from misinformation.  But they have emphasized that, as private entities, platforms bear the responsibility for setting and enforcing their own policies concerning misinformation—policies with which the government, like members of the public, may or may not agree.  In May 2021, for example, the White House Press Secretary expressed the President's view regarding social-media platforms' "responsibility" to "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections," but added that the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address the disinformation" and "misinformation" that "continue to proliferate on their platforms."  *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack* (May 5, 2021), https://perma. cc/4ZGE-N9QL (discussed in Complaint ¶ 22, RE1, PageID #8).

A July 2021 Surgeon General advisory similarly described harms caused by misinformation on social media, and offered "recommendations" for social-media platforms to address such harms, but did not impose any obligations on platforms or cabin their discretion to determine what constitutes misinformation and how (or whether) to combat it.  *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment*, https://perma.cc/KMU4-Q3RB (cited in Complaint ¶¶ 23-27, RE1, PageID #8-9).  To the contrary, the Advisory recognized that

"[d]efining 'misinformation' is a challenging task," that there is no "consensus definition of misinformation," and that "it is important to … avoid conflating controversial or unorthodox claims with misinformation" because "[t]ransparency, humility, and a commitment to open scientific inquiry are critical." *Id.* at 17. The Advisory accordingly encouraged technology platforms (among others) to consider how to "safeguard[] user privacy and free expression" while working to "curb the spread of harmful misinformation," *id.* at 6-7, and urged them to take into account "potential unintended consequences of content moderation, such as migration of users to less-moderated platforms," *id.* at 12.

In a joint press briefing with the Surgeon General on the day the Advisory was released, the White House Press Secretary stated that the government was "flagging … for Facebook" "problematic posts … that spread disinformation." *Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy* (July 15, 2021), https://perma.cc/Y3YQ-L8MD (cited in Complaint ¶¶ 28-31, RE1, PageID #9-11). In the following day's briefing, she explained that her reference to "flagging … problematic posts" was meant simply to reflect the government's practice of "regularly making sure social media platforms are aware of the latest narratives dangerous to public health" and "engag[ing] with them to better understand the enforcement of social media platform policies." *Press Briefing by Press Secretary Jen Psaki* (July 16, 2021), https://perma.cc/HE54-LB2R (cited in Complaint ¶¶ 32-41, RE1, PageID #11-12). She emphasized that the government does not "take anything down" or "block anything" and that platforms

themselves, as "private-sector compan[ies]," "make[] decisions about what information should be on their platform[s]." *Id.*

3.    In March 2022, the Surgeon General published in the Federal Register a Request for Information (RFI) seeking "input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID-19 pandemic." *Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID-19 Pandemic Request for Information (RFI)*, 87 Fed. Reg. 12,712, 12,712 (Mar. 7, 2022).  The RFI requested any comments by May 2, 2022.  It sought information on a broad range of topics, including "[i]nformation about sources of COVID-19 misinformation" on social media and elsewhere, such as "specific, public actors that are providing misinformation" and "components of specific platforms that are driving exposure to information." *Id.* at 12,714.  The RFI emphasized, however, that "[a]ll information should be provided at a level of granularity that preserves the privacy of users." *Id.* at 12,713-714.  Like the Surgeon General's Advisory, the RFI imposed no obligations; responses were purely voluntary.

### B.    This Action

1.    Plaintiffs Michael Senger, Mark Changizi, and Daniel Kotzin—alleging that Twitter disciplined them for posting misinformation—brought this action in March 2022 against the Department of Health and Human Services (HHS), its Secretary, and the Surgeon General (an HHS official).  The discussion below assumes the truth of plaintiffs' factual allegations, as is appropriate on a motion to dismiss, but does not

- 6 -

assume the truth of legal conclusions premised on conclusory statements. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Twitter suspended Senger's account for two brief periods in late October 2021 and permanently suspended his account on March 8, 2022. Complaint ¶¶ 61-62, RE1, PageID #16. Twitter's explanation for the permanent suspension was that Senger had "'spread[] misleading and potentially harmful information related to COVID-19'" by tweeting that "'every COVID policy—from the lockdowns and masks to the tests, death coding, and vaccine passes—has been one, giant fraud.'" *Id.* ¶¶ 64-65, RE1, PageID #16. Plaintiffs nonetheless allege "[u]pon information and belief" that "Twitter suspended Mr. Senger because of the Surgeon General's initiative"—which they define to mean, "[c]ollectively," the Press Secretary's May 5, 2021 "statements," the Surgeon General's July 2021 "Advisory," and the March 2022 RFI, "along with" what they refer to as "presumptive efforts by the Biden Administration that occurred in the interim." *Id.* at 3 n.1, RE1, PageID #3; *id.* ¶ 67, RE1, PageID #16-17. Plaintiffs base that assertion on the fact that the permanent suspension came the day after the publication of the RFI and on the claim that the tweet for which Senger was suspended "expressed an opinion that is shared by many individuals around the world." *Id.* ¶ 67, RE1, PageID #16-17.

Twitter has suspended Kotzin's account twice. Complaint ¶ 68, RE1, PageID #17. The first suspension, in late September 2021, was for 24 hours. *Id.* ¶ 69. That suspension came in response to a tweet stating in part that "'[t]here is not now, nor has there ever been, evidence that the Covid shots reduce infection or transmission.'" *Id.*

The second suspension, on an unstated date, came in response to a March 7, 2022, tweet stating in part that "'the global pandemic is ending not because of the vaccines, but because almost everyone on the planet got infected with covid.'" *Id.* ¶ 72. Plaintiffs allege "[o]n information and belief, for the same reasons" as with Senger, that "Kotzin's suspension resulted from the Surgeon General's initiative." *Id.* ¶ 74.

Finally, Twitter has taken various forms of action against Changizi's account. Twitter suspended the account for 12 hours in April 2021 after Changizi tweeted a link to an article asserting that masks were "'ineffective'" and "'harmful,'" and suspended it again in June 2021. Complaint ¶¶ 75, 77, RE1, PageID #17-18. Plaintiffs allege, on the basis of "alert[s]" from Changizi's "followers" and "monthly impression[]" data, that his account was "'de-boosted'"—such that his tweets appeared in others' "feeds much less frequently"—as early as May 2021. *Id.* ¶¶ 78-79, RE1, PageID #18. And Twitter suspended the account on December 18, 2021, but lifted the suspension nine days later after Changizi appealed. *Id.* ¶¶ 80-83, RE1, PageID #18-19. Changizi claims that, notwithstanding the lifting of the suspension, his tweets "are typically labeled 'age-restricted adult content'" and his account does not appear in user searches "unless his name is fully typed." *Id.* ¶ 84, RE1, PageID #19-20. As with Kotzin and Senger, plaintiffs allege "on information and belief," based on "the points at which Mr. Changizi's account was de-boosted and suspended," that the "de-boosting and suspension resulted from the Surgeon General's initiative." *Id.* ¶ 87, RE1, PageID #20.

Plaintiffs' complaint includes four claims.  First, plaintiffs claim that "the Surgeon General's initiative" lacks statutory authority.  Complaint ¶¶ 102-122, RE1, PageID #23-27.  Second, plaintiffs claim that the "initiative" violates the First Amendment.  *Id.* ¶¶ 123-146, RE1, PageID #27-31.  Third, plaintiffs claim that the Surgeon General's Request for Information constitutes a search in violation of the Fourth Amendment.  *Id.* ¶¶ 147-160, RE1, PageID #31-33.  Finally, plaintiffs claim that the "initiative" is unlawful and thus invalid under the Administrative Procedure Act (APA).  *Id.* ¶¶ 161-177, RE1, PageID #33-36.

Plaintiffs moved for a preliminary injunction, proposing that defendants be "prohibited from enforcing coercive policies or conditions … that exert pressure upon Twitter and other technology companies to censor users" and that they be "ordered to retract the … Request for Information."  Proposed Order, RE9-2, PageID #110.  Defendants moved to dismiss for lack of jurisdiction and failure to state a claim.

2.    The district court granted the motion to dismiss and denied plaintiffs' motion for a preliminary injunction as moot.  *Changizi v. HHS*, __ F. Supp. 3d __, 2022 WL 1423176 (S.D. Ohio May 5, 2022).

The court first held that plaintiffs had failed to establish either the causation or the redressability elements of the standard for Article III standing.  *Id.* at *7-12.  As to causation, the court noted that "Twitter establish[ed]—and progressively 'ramp[ed] up' the enforcement of—its COVID-19 Policy nearly one year before HHS allegedly 'commandeered' it."  *Id.* at *9.  And although plaintiffs contended that they were not actually

suspended for tweets in violation of the policy until "the Biden Administration began to broadly ask social media companies to 'do more' to combat COVID-19 'misinformation,'" the court observed that "the entire administration is not a defendant here"—only "HHS is"—"[a]nd Plaintiffs' own alleged timeline of events betrays the notion that HHS acted in any specific way to confront COVID-19 'misinformation' *before* Twitter began to heavily enforce its COVID-19 Policy." *Id.* To the contrary, "Plaintiffs contend that Twitter began to increasingly suspend users for posting COVID-19 'misinformation' in March of 2021," *id.*, well before the events alleged to constitute "the Surgeon General's initiative," Complaint 3 n.1, RE1, PageID #3. The court therefore concluded that plaintiffs' complaint did not support a "reasonable inference" that HHS had "'command[ed]'" Twitter's conduct. 2022 WL 1423176, at *10. For similar reasons, the court concluded that plaintiffs' allegations failed to "establish that their requested relief is 'substantially likely' to mitigate Twitter's enforcement of its COVID-19 Policy" and thus to "'redress' [plaintiffs'] alleged injuries." *Id.* at *12.

The court proceeded, "in the interest of thoroughness," to explain that plaintiffs' claims would fail on the merits even if plaintiffs had standing. 2022 WL 1423176, at *12. First, the court explained, plaintiffs' First Amendment claim fails because Twitter's actions against plaintiffs cannot be considered state action: HHS's "efforts to confront COVID-19 misinformation, as alleged, do not 'reasonably' constitute an exercise of 'coercive power' over Twitter." *Id.* at *15 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). Second, the court held that plaintiffs' Fourth Amendment claim fails because

their allegations do not "plausibly establish[] that the RFI is anything other than … a mere non-compulsory request for information from the government," which "is not a 'search.'" *Id.* at *16. Third, the court concluded that plaintiffs' APA claim fails because plaintiffs have not identified final agency action within the meaning of the APA. *Id.* at *17-18. Finally, the court rejected plaintiffs' *ultra vires* claim, explaining that "agencies may issue 'non-binding [policy] statements' on various topics even if they lack 'legislative rulemaking authority' in relation thereto," *id.* at *18, and that the RFI was not an "'unreasonable'" request for information, *id.* at *19.

3.    More than a month after the district court's ruling, plaintiffs moved to amend their complaint to add a new plaintiff, new defendants (including the President of the United States), and additional allegations. The district court denied the motion without prejudice, explaining that after the "'entry of final judgment, a party may not seek to amend their complaint without first moving to alter, set aside or vacate judgment pursuant to either Rule 59 or Rule 60 of the Federal Rules of Civil Procedure.'" Order, RE41, PageID #644 (quoting *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 624 (6th Cir. 2008)). The court noted that, since more than 28 days had elapsed after the entry of judgment, plaintiffs could no longer seek relief under Rule 59. *Id.* PageID #644-645.

Plaintiffs then filed a motion for relief from the judgment under Rule 60(b), invoking "newly discovered evidence." Motion, RE42, PageID #646. Six days later, however, plaintiffs noticed this appeal from the dismissal of their complaint. Notice

of Appeal, RE43, PageID #690.  The district court accordingly denied plaintiffs' Rule 60(b) motion—as well as a subsequent motion for leave to file a supplement to that motion, RE50, PageID #719-723—for lack of jurisdiction, explaining that, "[i]n this circuit, a 'notice of appeal operates to transfer jurisdiction of the case to the court of appeals, and the district court is thereafter without jurisdiction to grant a motion under'" Rule 60(b).  Opinion and Order, RE52, PageID #733.  Plaintiffs did not appeal that ruling.

## SUMMARY OF ARGUMENT

This Court should affirm the dismissal of this suit.

I.     The district court was correct to determine that there is no concrete case or controversy between plaintiffs and defendants.  Where a plaintiff's harm arises from the action of a third party—here, Twitter—jurisdiction is proper only if the plaintiff can show that "the defendant's actions had a 'determinative or coercive effect' upon the third party"; otherwise, "the claimant's quarrel is with the third party, not the defendant." *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021), *cert. denied*, 142 S. Ct. 225 (2021). The complaint's allegations do not support that inference.  To the contrary, the allegations show that Twitter adopted the misinformation policy under which it disciplined plaintiffs well *before* any of the governmental actions that plaintiffs characterize as the supposedly coercive "initiative" (Complaint 3 n.1, RE1, PageID #3).

Although plaintiffs briefly assert that their complaint's allegations were sufficient to establish jurisdiction, their primary contention is that their claims should be treated

as plausibly establishing jurisdiction in light of documents produced in discovery in other cases and not referenced in their complaint. These arguments are procedurally and substantively flawed. Procedurally, the district court properly resolved this case based on the record before it, and plaintiffs have not challenged that court's denial of their motion for leave to amend their complaint. And substantively, plaintiffs' one-sided account of disputed facts that were not before the district court does not support a plausible inference that the government caused any of the injuries at issue here or that those injuries would be redressed by a favorable decision.

II.     Although the absence of jurisdiction entirely resolves this appeal, the district court was correct to hold in the alternative that plaintiffs' claims are also meritless.

1.     Plaintiffs' First Amendment claim fails because the complaint does not allege the type of governmental pressure that could cause Twitter's particular content-moderation decisions—namely, its decisions to discipline the three plaintiffs—to constitute state action. The government "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). And the plaintiff must show not just that the government coerced a private entity in some fashion but that the government was "responsible for the *specific* conduct of which the plaintiff complains.'" *Id.* (emphasis added and omitted).

Plaintiffs plead no basis to conclude that the government pressured Twitter to discipline them.  To the contrary, the statements on which plaintiffs rely repeatedly made clear that Twitter and other platforms, not the government, bore responsibility for determining their policies regarding misinformation and for enforcing any policy they might choose to adopt.  And Twitter both adopted its COVID-19 misinformation policy (in 2020) and, according to plaintiffs, began to enforce the policy with greater rigor (in March 2021), *before* these supposedly coercive actions occurred.

Making virtually no effort to defend the adequacy of the allegations in the complaint, plaintiffs again rely heavily on factual assertions not found in the complaint.  But those assertions are not properly considered in this appeal, and once again fail on their own terms in any event.

2.    Plaintiffs' ultra vires, APA, and Fourth Amendment claims are equally meritless.  The agency actions at issue—the Surgeon General's Advisory and Request for Information—imposed no obligations on anyone, so they did not require a specific delegation of power from Congress, they do not constitute final agency action within the meaning of the APA, and the Request for Information does not constitute a search within the meaning of the Fourth Amendment.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's denial of a motion to dismiss for lack of subject-matter jurisdiction or failure to state a claim."  *Devereux v. Knox County*, 15 F.4th 388, 392 (6th Cir. 2021).

**ARGUMENT**

## I.   There Is No Concrete Case Or Controversy Between Plaintiffs And Defendants

The district court was correct to determine that plaintiffs have failed to allege a sufficient basis for Article III jurisdiction, for the basic reason that their grievances are with Twitter and not with defendants.  Federal jurisdiction lies only where a plaintiff's injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (alterations omitted).  And here, plaintiffs' claimed injury is the imposition of discipline—or self-censorship for fear of discipline—by Twitter.  It is not an injury imposed by the government itself.

1.     Plaintiffs' theory of jurisdiction is that the government is *influencing* Twitter's imposition of discipline for pandemic-related misinformation.  But where a plaintiff's harm arises from the action of a third party, rather than the defendant, jurisdiction is proper only if the plaintiff can show that "the defendant's actions had a 'determinative or coercive effect' upon the third party"; otherwise, "the claimant's quarrel is with the third party, not the defendant."  *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021) (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)), *cert. denied*, 142 S. Ct. 225 (2021).  "'[A]n injury that results from the third party's *voluntary and independent* actions' does not establish traceability; the government must do more, say by establishing a '*command*' of the third party's actions."  *Id.* at 317 (quoting *Crawford v. U.S. Dep't of Treasury*, 868 F.3d

438, 457 (6th Cir. 2017)). And as with any element of its claims, a plaintiff "cannot rely on general or conclusory allegations" to establish jurisdiction at the pleading stage; it must allege a sufficient factual basis for the inference of jurisdiction to be "plausible." *Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021).

Plaintiffs have not come close to pleading a sufficient factual basis to support a plausible inference that the government's actions—much less the actions of the particular defendants here—deprived Twitter of a voluntary choice either to institute its misinformation policies in general or to discipline plaintiffs in particular. Exactly the opposite inference arises from the allegations in the complaint. As early as December 2020, before any of the governmental actions that plaintiffs characterize as the supposedly coercive "initiative" (Complaint 3 n.1, RE1, PageID #3), Twitter's policy was to discipline users for tweeting "[f]alse claims that COVID-19 is not real or not serious, and therefore that vaccinations are unnecessary," as well as "false or misleading information about … [t]he nature of the virus" or "[t]he efficacy and/or safety of preventative measures, treatments, or other precautions to mitigate or treat the disease." Twitter Safety, *COVID-19: Our Approach to Misleading Vaccine Information* (Dec. 16, 2020), https://perma.cc/8FXZ-EC2K (cited in Complaint ¶ 18 & n.6, RE1, PageID #7). Twitter applied that policy to the tweets for which plaintiffs were disciplined—tweets stating in Senger's case that "'every COVID policy … has been one, giant fraud,'" in Kotzin's case that there is no "'evidence that the Covid shots reduce infection or

transmission,'" and in Changizi's case that masks are "'ineffective'" and "'harmful.'" Complaint ¶¶ 64, 69, 75, RE1, PageID #16-17.

Plaintiffs identify no basis to doubt that Twitter's policy, adopted in 2020, was voluntary and independent of the government's challenged actions in 2021 and 2022. Nor do plaintiffs provide any factual basis to support an inference that Twitter would not have disciplined them in the absence of the alleged pressure from the federal government.

The D.C. Circuit reached a similar holding, on similar facts, in *Association of American Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022). The plaintiff there sued a Member of Congress who had written to various technology companies "expressing concern about vaccine-related misinformation on their platforms," on the theory that those "inquiries prompted the technology companies to disfavor and deprioritize its vaccine content." *Id.* at 1030. But the court found the plaintiffs' allegations insufficient to establish an Article III controversy with the Member of Congress, explaining that "the technology companies may have taken" disciplinary action against the plaintiff "for any number of reasons unrelated to" the Member's inquiry, and that "[t]he timeline of events"—in particular, the fact that the companies' policies predated the inquiry—"also undermines any possibility that the companies acted at" the Member's "behest in particular." *Id.* at 1034. And the Court reached that conclusion even though, unlike in this case, the letter from the Member of Congress to the technology

companies had *preceded* actions they allegedly took to "disfavor and deprioritize … vaccine-related information." *Id.* at 1030-1031.

2.     Plaintiffs offer essentially three responses.  None is persuasive.

a.     Plaintiffs first attempt (Br. 20) to excuse the fact that "the timeline" of their allegations "did not precisely match"—that is, the fact that Twitter adopted the policies under which they were disciplined long before the allegedly coercive actions of government officials—on the theory that, "more than likely," "some behind-the-scenes communications between the tech companies and government took place prior to the Administration's public announcements."  This theory fails on multiple levels.

As discussed above, the relevant Twitter policies were adopted in 2020—before President Biden, or any of the public officials whose statements plaintiffs invoke, took office.  To the extent the senior officials in office in 2020 engaged in any "behind-the-scenes communications" (Br. 20) with Twitter—which plaintiffs certainly have not alleged with specificity—it is decidedly implausible that such communications somehow previewed the allegedly coercive actions taken by different officials in 2021.

To the extent plaintiffs mean to assert that behind-the-scenes communications occurred in March 2021—when they claim "that Twitter began to increasingly suspend users for posting COVID-19 'misinformation,'" *Changizi v. HHS*, 2022 WL 1423176, at *9 (S.D. Ohio May 5, 2022)—that theory is equally problematic.  As the district court observes, it rests on "'bald speculation'" about whether such communications occurred at all, to say nothing of "who participated in these talks, when they occurred, or what

they supposedly entailed." *Id.* at *9 n.1. Those are exactly the sorts of factual specifics that a complaint must plead to support jurisdiction or any other prerequisite to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also, e.g., CFTC v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019) (claim is plausible only once it "rise[s] 'above the speculative level'"). Plaintiffs are suggesting, in effect, that the complaint adequately alleges that the government caused their injuries because Twitter's alleged crackdown on COVID-19 misinformation is *consistent* with the possibility that government officials pressured Twitter to take that step. But the Supreme Court rejected a similar theory in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007), explaining—where a group of companies had engaged in "parallel conduct" arguably suggestive of a conspiracy—that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.* at 556. Just as "a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality" in the antitrust context, *id.* at 557, a conclusory allegation that the government caused plaintiffs to be disciplined by Twitter does not suffice to establish, with the requisite degree of plausibility, a concrete controversy between plaintiffs and the government.

Plaintiffs' response (Br. 20) is that they "had no conceivable means of acquiring concrete information to corroborate their suppositions without a discovery order." But Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-679. And as noted above, plaintiffs lack any factual basis for their jurisdictional theory. The theory appears to be that Twitter

adopted policies in 2020 that provided for discipline of the sort of speech in which they later engaged, but that Twitter did not actually care enough to enforce its own policies until the government made it do so. Plaintiffs have pleaded no factual specifics sufficient to elevate that theory from speculative to plausible.

b.       Plaintiffs next contend (Br. 20-26) that the supposed impropriety of the district court's ruling was "borne out by information that surfaced subsequently"— namely, documents produced in discovery in other cases presenting similar allegations. These assertions are not properly before this Court, and even on their own terms would not suffice to save plaintiffs' claims, as the assertions do not fill the critical gaps in plaintiff's account. They provide no reason to doubt that, when Twitter adopted the policies to which plaintiffs were subject, it acted independent of any pressure from the government. Nor do they provide any reason to believe that the government somehow compelled Twitter to apply those policies to plaintiffs.

As this case's procedural posture demonstrates, plaintiffs are not entitled to rely on materials outside the pleadings, much less materials that were not before the district court at the time that it resolved the motion to dismiss and thus are not part of the record on appeal. The government's motion to dismiss this case for lack of jurisdiction, which rested on the pleadings and materials referenced in the pleadings, was a "facial attack"—one that "'questions merely the sufficiency of the pleading,'" with the plaintiffs' allegations taken "'as true,'" *Howard v. City of Detroit*, 40 F.4th 417, 422 (6th Cir. 2022). It was not "'a factual attack,'" where "'no presumptive truthfulness applies to

the allegations' and 'the district court has wide discretion' to review evidence outside the complaint'" and make "factual findings," *id.*[2]  Plaintiffs evidently agree with that characterization, because they repeatedly invoke the presumptive truth of their allegations.  Yet by extensively invoking "evidence outside the complaint," *id.*—evidence not properly considered on a facial motion to dismiss for lack of jurisdiction—plaintiffs are trying to have it both ways.  They want to benefit from the presumption of truth, available only on a motion limited to the pleadings, while also invoking evidence absent from the pleadings, which cannot properly be considered in resolving such a motion.

If plaintiffs wanted to make new factual allegations, they could have sought leave to amend their complaint in a procedurally proper fashion by filing a timely Rule 59 motion within 28 days after the district court's dismissal of their initial complaint.  Such a motion would have tolled the deadline for plaintiffs to appeal the dismissal.  Fed. R. App. P. 4(a)(4)(A)(iv).  Instead, as noted above, plaintiffs waited more than a month after the district court's ruling to seek leave to amend their complaint—and did so

---

[2] Although the district court regarded the nature of the motion as somewhat less clear, the court ultimately concluded—consistent with the nature of a facial challenge—that it would "cabin its 'jurisdictional inquiry' to the non-conclusory allegations in Plaintiffs' complaint, which it [would] accept and favorably construe."  2022 WL 1423176, at *3.  And the district court's reason for finding the nature of the motion unclear—namely the fact that the government's motion to dismiss "relie[d] on various posts by Twitter officials"—was incorrect because, as the court noted, plaintiffs "directly reference[d]" "portions of" those posts "in their complaint."  *Id.*  As noted above (at 2 n.1), documents that are "referred to in the pleadings" and "integral to the claims" "may be considered" in resolving a motion for which the record is otherwise limited to the pleadings themselves.  *In re Fair Finance Co.*, 834 F.3d 651, 656 n.1 (6th Cir. 2016).

without first seeking relief under Rule 59 or Rule 60, causing the district court to deny their motion without prejudice. *See* Motion, RE40, PageID #489-495; Order, RE41, PageID #644-645. And when plaintiffs eventually sought relief from the judgment under Rule 60(b), Motion, RE42, PageID #646-653 (and later sought to file a supplement, Motion, RE50, PageID #719-723), plaintiffs' filing of this appeal had divested the district court of jurisdiction, as the district court concluded in an order that plaintiffs have not appealed. Order, RE52, PageID #733-734. Thus, only the complaint's allegations are properly before this Court—not the new account that plaintiffs have fashioned on appeal, based on materials that are beyond the record and that the district court never had occasion to address.

In a halfhearted attempt to justify their presentation of new materials on appeal, plaintiffs "request" in a footnote "that the Court take judicial notice of" the supposed "facts" that they are invoking. Br. 20 n.3. But facts are judicially noticeable only if they are "not subject to reasonable dispute," such as where they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Plaintiffs suggest (Br. 20 n.3) that the "facts" in question can be judicially noticed because they "are a matter of public record, and many … were included in filings." But that argument misunderstands the nature of judicial notice. Statements in public records or judicial filings can be judicially noticed for the fact of their existence, not for their truth. *See, e.g.*, *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 467 (6th Cir. 2014); *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 576 (6th Cir. 2008). The

"facts" of which plaintiffs seek judicial notice are—to put it mildly—"subject to rea-

sonable dispute," Fed. R. Evid. 201(b).  For example, when plaintiffs say (Br. 21) that

emails produced in another case "revealed the existence of 'a massive, sprawling federal

Censorship Enterprise,'" what they are actually quoting (without explanation or ac-

knowledgment) is a filing by their own counsel characterizing discovery in another case.

Joint Statement on Discovery Disputes 3, *Missouri v. Biden*, No. 22-cv-1213, Dkt. 71

(W.D. La. Aug. 31, 2022).

At any rate, even if plaintiffs' new "facts" were considered, they would have no

bearing on this case.  Plaintiffs find fault with a broad range of statements by govern-

ment officials, characterizing them as evidence of censorship or improper collusion.

While the government vigorously disputes plaintiffs' characterization of the documents

in question, and the legal conclusions plaintiffs attempt to draw from those documents,

for present purposes it suffices that even on their own terms the newly identified doc-

uments do not come close to plausibly establishing that the government caused Twitter

to discipline plaintiffs and is continuing to cause that injury on a forward-looking basis.

None of the new "facts" that plaintiffs assert (Br. 20-26) has anything to do with the

individual plaintiffs here.

c.    Finally, plaintiffs contend (Br. 26-32) that the district court erred in focus-

ing on whether their allegations showed that the HHS defendants—as opposed to other

Administration officials—had "acted in any specific way to confront COVID-19 'mis-

information' before Twitter began to heavily enforce its COVID-19 Policy," 2022 WL

1423176, at *9 (emphasis omitted). Plaintiffs argue that, because "Article II 'makes a single President responsible for the actions of the Executive Branch,'" *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 496-497 (2010), the President's statements can properly be considered "as proof that the Administration is unlawfully entangled in social media companies' censorship machinations." Br. 27.

The problem for plaintiffs is that they did not bring this suit (nor could they have) to seek an injunction against "the Administration" in general (Br. 27); they brought it against HHS and two senior HHS officials, seeking an injunction against them in particular. And to establish standing, even at the pleading stage, plaintiffs must plausibly allege that their injury is "'fairly … trace[able] to the challenged action *of the defendant*.'" *Lujan*, 504 U.S. at 560 (emphasis added). Statements by other government officials, whether or not they shed light on some broad effort by "the Administration" (Br. 27), cannot establish the plausibility of plaintiffs' claim that Twitter disciplined them "because of the Surgeon General's initiative," Complaint ¶ 67, RE1, PageID #16-17; *see id.* ¶ 73, PageID #17; *id.* ¶ 87, PageID #20.

In any event, as discussed above, the district court did not "refuse[] to consider" (Br. 26) statements by other government officials. Rather, the court explained that—even "[s]etting aside the fact" that the other officials whose statements plaintiffs invoke are not "defendants in this case"—plaintiffs' supposition that those other officials must have had backchannel conversations with Twitter, before HHS engaged in the activities

alleged to constitute "the Surgeon General's initiative," Complaint 3 n.1, RE1, PageID #3, amounts to "'bald speculation.'"  2022 WL 1423176, at *9 n.1.

3.     Finally, even if the Court concludes that the district court erred in granting the government's motion to dismiss for lack of jurisdiction, the Court should remand for the district court to consider an additional jurisdictional question that has arisen since the time of the district court's initial ruling, rather than proceeding to resolve the merits of an action in which the federal courts may well lack jurisdiction.  As the Court may be aware, Twitter recently was acquired by a new owner.  In the wake of that acquisition, Twitter announced that, as of November 23, 2022, it "is no longer enforcing" its "COVID-19 misleading information policy."  Twitter, *COVID-19 Misinformation*, https://perma.cc/Y2B9-QCBM.  Thus, even if the government had influenced Twitter in the past in a way that affected plaintiffs, there is no plausible reason to believe that any government action could be the legal cause of any ongoing injury or that any such injury would be redressed by an injunction against government officials, given that Twitter has now repudiated the policy that plaintiffs accuse the government of forcing Twitter to implement.  *See, e.g.*, *O'Shea v. Littleton*, 414 U.S. 488, 495-496 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, … if unaccompanied by any continuing, present adverse effects.").

## II.     The Complaint Fails To State A Claim On The Merits

In any event, even if plaintiffs had adequately alleged a basis for jurisdiction, their claims are uniformly meritless.

### A.    Plaintiffs' First Amendment Claim Is Meritless

1.    Because the First Amendment forbids only governmental conduct, not conduct by private entities like Twitter, plaintiffs' First Amendment claim rests on the proposition that Twitter's "seemingly private behavior 'may be fairly treated as that of the [government] itself,'" *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  But the Supreme Court has tightly limited the circumstances under which a private party's conduct is to be treated as if it were the government's.  Those limitations are necessary both to protect the "freedom" of private actors and to protect the government against "the imposition of responsibility … for conduct it could not control."  *Id.* (quotation marks omitted).  The government "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  And the plaintiff must show not just that the government coerced a private entity in some fashion but that the government was "responsible for the *specific* conduct of which the plaintiff complains."  *Id.* (emphasis added and omitted).

*Blum* illustrates the stringency of the standard.  There, the plaintiffs—a class of Medicaid patients—contended that nursing homes violated the Due Process Clause by "discharg[ing] or transfer[ring] patients without notice or an opportunity for a hearing," and the question was "whether the State [could] be held responsible for those decisions."  457 U.S. at 993.  The State "extensively" regulated the nursing homes in

question, *id.* at 1004, including in ways that bore on the nursing homes' transfer and discharge decisions. For example, state regulations required nursing homes "'to make all efforts possible to transfer patients to the appropriate level of care or [to] home as indicated by the patient's medical condition or needs,'" and "impose[d] a range of penalties on nursing homes that fail[ed] to discharge or transfer patients whose continued stay [was] inappropriate." *Id.* at 1007-1009. The State also had to "approve or disapprove continued payment of Medicaid benefits after a change in the patient's need for services." *Id.* at 1010. In short, the State placed various forms of pressure on nursing homes to discharge patients or transfer them to lower levels of care. Yet the Court held that the plaintiffs had failed to establish state action because the nursing homes' "decision[s] to discharge or transfer *particular patients* … ultimately turn[ed] on medical judgments made by private parties." *Id.* at 1008 (emphasis added).

The Supreme Court has thus emphasized that, even independent of the separate requirement that any government pressure be sufficiently coercive to render a third party's actions attributable to the government, the government's pressure must be targeted at the specific actions that harmed the plaintiff in order for the third party's bowing to that pressure to constitute state action. For example, in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)—in which the Supreme Court held that the Rhode Island Commission to Encourage Morality in Youth had violated the First Amendment by pressuring book distributors to stop disseminating certain works—the Court pointed to the fact that the Commission had applied the pressure in a highly particularized

manner. "The Commission's practice," the Court explained, was "to notify a distributor … that *certain designated books* or magazines distributed by him had been reviewed by the Commission and had been declared … to be objectionable," to thank the distributor "in advance[] for his 'cooperation,'" generally to "remind[]" him "of the Commission's duty to recommend to the Attorney General prosecution of purveyors of obscenity," and then to follow up by arranging a visit from "[a] local police officer … to learn what action" the distributor "had taken" after receiving the notice. *Id.* at 61-63 (emphasis added). In those circumstances, unlike in *Blum*, the Court concluded that the Commission had effectively dictated distributors' decisions whether to continue disseminating particular works. *See id.* at 72.

Much the same was true in the cases on which plaintiffs rely. In *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), for example, a county sheriff sent a letter demanding that Visa and MasterCard "prohibit the use of their credit cards to purchase any ads on" a particular website containing advertisements for adult services—a letter that the court regarded as containing an "ominous threat" that the credit card companies could be held liable "'for allowing suspected illegal transactions to continue to take place.'" *Id.* at 230, 232. In *Okwedy v. Molinari*, 333 F.3d 339 (2d Cir. 2003) (per curiam), a government official was alleged to have pressured a billboard company to take down a particular series of signs that he found offensive. *Id.* at 341-342. In *Peterson v. City of Greenville*, 373 U.S. 244 (1963), the Supreme Court held that the management of a lunch counter had engaged in state action when it excluded African-American patrons

because that decision was required by municipal law. *Id.* at 248. And in *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*, 827 F.2d 1291 (9th Cir. 1987), the Ninth Circuit held that a phone company's termination of service to a "salacious" telephone hotline was state action where a county attorney had "advised [the phone company] to terminate [the hotline's] service and threatened to prosecute [the phone company] if it did not comply." *Id.* at 1292, 1295. In all those cases—as in *Bantam Books*, and unlike in *Blum*—government officials had pressured the private entities in question to engage in "the specific conduct of which the plaintiff complain[ed]," *Blum*, 457 U.S. at 1004.

2.    The complaint here does not come close to pleading the type of governmental pressure that could cause Twitter's particular content-moderation decisions—namely, its decisions to discipline the three plaintiffs—to constitute state action.

The complaint bases its accusations of coercion on (1) a May 2021 press briefing at which the White House Press Secretary stated "'[t]he President's view'" that social-media "'platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation'"; (2) the Surgeon General's July 2021 advisory describing harms caused by misinformation on social media and offering recommendations for platforms to address those harms; and (3) the Surgeon General's March 2022 Request for Information. *See* Complaint ¶ 22-54, RE1, PageID #8-15; *see also id.* at 27, PageID #27 (identifying "[t]he Surgeon General's Initiative" as the source of the alleged First Amendment violation);

*id.* at 3 n.1, PageID #3 (defining "the Surgeon General's initiative" to mean, "[c]ollectively," the Press Secretary's May 2021 "statements," the Surgeon General's July 2021 "Advisory," and the March 2022 Request for Information, "along with presumptive efforts by the Biden Administration that occurred in the interim"). But none of those statements coerced Twitter to adopt particular content-moderation policies—much less to engage in "the specific conduct of which" plaintiffs complain, *Blum*, 457 U.S. at 1004.

Far from coercing Twitter to take specific action, as discussed above, all three statements made clear that Twitter and other platforms, not the government, bore responsibility for determining their policies regarding misinformation and for enforcing any policy they might choose to adopt. The Press Secretary's May 2021 statement emphasized the President "believe[s] in First Amendment rights" and that "social media platforms need to make" "the decisions" regarding "how they address the disinformation" and "misinformation" that "continue to proliferate on their platforms." *Press Briefing by Press Secretary Jen Psaki and Secretary of Agriculture Tom Vilsack* (May 5, 2021), https://perma.cc/4ZGE-N9QL (discussed in Complaint ¶ 22, RE1, PageID #8). The Surgeon General's July 2021 Advisory recognized that there is no "consensus definition of misinformation" and that "it is important to … avoid conflating controversial or unorthodox claims with misinformation," because "[t]ransparency, humility, and a commitment to open scientific inquiry are critical." *Confronting Health Information: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* 17, https://perma. cc/KMU4-Q3RB (cited in Complaint ¶ 23-27, RE1, PageID #8-9). And the Request

for Information simply sought voluntary "input from interested parties on the impact and prevalence of health misinformation in the digital information environment during the COVID-19 pandemic," 87 Fed. Reg. at 12,712; it did not call on Twitter or anyone else to change their policies.

As the complaint itself makes clear, moreover, Twitter both adopted the relevant misinformation policy (in 2020) and, according to plaintiffs, began to enforce the policy with greater rigor (in March 2021), *before* these supposedly coercive actions occurred. *See* Complaint ¶¶ 17-21, RE1, PageID #7-8. In other words, plaintiffs ask the Court to treat Twitter's adoption and enforcement of its COVID-19 misinformation policy as governmental conduct even though Twitter was already engaging in that conduct before the government supposedly forced it to do so. It would be hard to conceive of circumstances where it would be *less* plausible for a private entity's conduct to be "deemed … that of the" government, *Blum*, 457 U.S. at 1004.

Moreover, even if plaintiffs had plausibly alleged that statements by government officials had coerced Twitter to adopt a particular moderation policy for COVID-related content, the complaint would still fail to establish that the government pressured Twitter to engage in "the specific conduct of which" plaintiffs complain, *Blum*, 457 U.S. at 1004—namely, Twitter's determination that particular tweets by these three plaintiffs violated the policy. The complaint makes no allegation that any government official was even aware of tweets by the three plaintiffs, much less that any official pressured Twitter to impose any sort of discipline for those tweets.

3.a.    Plaintiffs make virtually no effort to defend the adequacy of the allegations in the complaint. Their argument that the government coerced or substantially encouraged Twitter's enforcement of its COVID-19 misinformation policy rests almost wholly on factual assertions not found in the complaint—assertions that, even on their own terms, do not contain the sorts of specifics that plaintiffs would need in order to plausibly allege that Twitter's actions with regard to their accounts can be attributed to the government. For example, plaintiffs make assertions about emails from employees of the Centers for Disease Control or the Department of Homeland Security (neither of which is a defendant here) that on their face do not concern plaintiffs at all; "[w]ritten communications between employees at Twitter" regarding responses to inquiries from the government about a nonparty to this case; and text messages, again unrelated to plaintiffs, between government officials and employees of technology platforms. Br. 37-41. For both procedural and substantive reasons, these documents have no bearing on the proper disposition of this appeal, and this appeal accordingly does not present an occasion for a detailed response to plaintiffs' rhetoric about them.

As a procedural matter, the "'general rule'" discussed above—for which plaintiffs have rightly not suggested that any of the limited exceptions might apply—is that "'matters outside the pleadings may not be considered in ruling on'" a motion to dismiss under Rule 12(b)(6). *In re Fair Finance Co.*, 834 F.3d at 656 n.1. Plaintiffs cannot now ask this Court to reverse the district court's dismissal of their complaint on the basis of information never included in the complaint or raised before the district court. *See also*

*supra* pp. 21-22 (noting that plaintiffs' procedurally improper efforts to amend their complaint are not before this Court).

And as a substantive matter, plaintiffs' assertions—focused on interactions between the government and social-media platforms having nothing to do with plaintiffs themselves—would shed no light on the plausibility of plaintiffs' own claims. As discussed above, those claims relate to policies set unilaterally by Twitter before the alleged coercion—policies whose application to plaintiffs is not discussed in any of the documents. And even if it were proper to consider facts beyond the record of this case, the most salient fact (which is indisputable and thus could arguably be subject to judicial notice) cuts against plaintiffs' position: As noted above, Twitter has now announced that it has *stopped* enforcing its COVID-19 misinformation policy. That is a strong indication that, contrary to plaintiffs' arguments, the government has not applied to Twitter the sort of irresistible pressure that would justify treating Twitter's conduct as "that of the" government, *Blum*, 457 U.S. at 1004. Government officials have simply done what it is their prerogative to do: express their views about how a responsible private corporation *should* act. Twitter has always been free to disagree with those views, and it has now done so.

The cases on which plaintiffs rely do not strengthen their claim. In cases like *Peterson*, *Carlin*, and *Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429, 1434 (9th Cir. 1989), courts have made clear that if a plaintiff shows the sort of specific governmental pressure discussed above—sufficiently strong pressure to engage in "the specific

conduct of which" plaintiffs complain, *Blum*, 457 U.S. at 1004—then it is immaterial whether the private entity pressured by the government might have engaged in the same conduct absent the governmental pressure. But here, plaintiffs have not shown the requisite type of governmental pressure in the first place and, as noted, Twitter has already reversed course and adopted a policy more favorable to plaintiffs despite the alleged governmental coercion. And because plaintiffs have not come close to plausibly alleging that the relevant specific actions by Twitter were a response to any request by the government (whether or not the official making the request had direct regulatory authority), it is irrelevant whether, as plaintiffs assert, the government could coerce third parties through officials who lack the direct authority to regulate those parties.

b.    Plaintiffs also briefly invoke (Br. 41-42) an additional theory of state action: that the actions of a private entity may be attributed to the government where the "private actor operates as a 'willful participant in joint activity with the State or its agents,'" *Brentwood*, 531 U.S. at 296 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)). For example, in *Lugar*, which first articulated the theory, the Supreme Court held that a corporation was a state actor when, exercising authority conferred on it by state law, it obtained a prejudgment attachment of property to satisfy what it claimed was a debt. And in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020), which plaintiffs invoke, the Ninth Circuit held that a private psychiatric treatment facility and its employees engaged in state action when a county prosecutor "was heavily

involved in the[ir] decisionmaking process regarding" the "detention, diagnosis, and treatment" of a criminal suspect. *Id.* at 753-754.

But nothing in plaintiffs' allegations remotely establishes that sort of close involvement by government officials in Twitter's application of its COVID-19 misinformation policy—much less Twitter's application of its policy to plaintiffs' particular accounts. That is why plaintiffs again rely heavily on facts beyond the record in this case. But even those facts do not help plaintiffs' cause. Consider, for example, plaintiffs' suggestion that the government "demanded the de-platforming of specific disfavored speakers" (Br. 42)—presumably a reference to the extra-record documents in which, according to plaintiffs, "Twitter employees … described … 'really tough' and 'pointed' questions" from White House officials "about 'why Alex Berenson hasn't been kicked off the platform'" (Br. 25). Even if that encounter occurred in exactly the manner that plaintiffs describe—a conclusion that, at an absolute minimum, would not be the proper subject of judicial notice—the encounter does not show Twitter acting hand-in-hand with the government to de-platform Berenson. To the contrary, as plaintiffs recount (Br. 25 n.5), the immediate response from Twitter employees to an internal discussion of those pointed questions was not to bow to what plaintiffs characterize as governmental pressure but to determine that Berenson had not, in fact, "violated any of Twitter's rules." Far from the sort of intermixing of private and governmental power at issue in cases like *Lugar* and *Rawson*, this account shows Twitter and the government each playing a distinct and proper role: in the government's case, expressing the desire

for a private corporation to act in a particular way; and in Twitter's case, determining on its own what policies to set and how to enforce those policies.

### B.    Plaintiffs' Other Claims Are Equally Meritless

The district court was equally correct to hold that, if it had jurisdiction, it would have dismissed plaintiffs' ultra vires, APA, and Fourth Amendment claims.

1.    Plaintiffs claim that the actions taken by defendants—the issuance of the Surgeon General's Advisory and Request for Information—exceed the authority delegated to defendants by Congress. But agencies and their officials require statutory authority to take actions "that carry the force of law," not to take actions or make statements that are "non-binding." *Batterton v. Marshall*, 648 F.2d 694, 701-702 (D.C. Cir. 1980); *cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). Unlike the CDC's eviction moratorium or other actions that plaintiffs invoke (like the "conditional sailing order" at issue in *Florida v. Becerra*, 544 F. Supp. 3d 1241 (M.D. Fla. 2021)), the actions here are plainly of the non-binding variety. The Surgeon General's Advisory was nothing more than a public statement of the Surgeon General's views; as the Advisory explained (at 3), "[a] Surgeon General's Advisory is a public statement that calls the American people's attention to a public health issue and provides recommendations for how that issue should be addressed." The Advisory imposed no obligations on anyone. And the Request for Information was likewise a purely voluntary solicitation of "input from interested parties"

on a topic of public concern.  87 Fed. Reg. at 12,712.  Serious separation-of-powers concerns would arise if, as plaintiffs suggest, Executive Branch officials were disabled from communicating their views on a matter of public concern, or from seeking input from members of the public, without Congress's prior blessing, and plaintiffs point to no decision imposing that sort of limitation.

Plaintiffs are equally incorrect to invoke the rule that an agency's request for information is valid only if reasonable.  That rule—which the Supreme Court has articulated as arising from the Fourth Amendment, not from statutory limits on an agency's power, *see United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)—comes into play where an agency seeks to *enforce* the request, as in *United States v. Gurley*, 384 F.3d 316, 321 (6th Cir. 2004).  It is not an independent basis for holding that a purely voluntary request for information is invalid.  Nor is this a situation, as in *National Association of Letter Carriers v. U.S. Postal Service*, 604 F. Supp. 2d 665 (S.D.N.Y. 2009), where a request for information is alleged to have been unlawful because it violated a legal requirement.

2.    Plaintiffs' APA claim fails for similar reasons.  An agency action that is not specifically "made reviewable by statute" is reviewable under the APA only if it constitutes "final agency action."  5 U.S.C. § 704.  "An agency action must generally meet two conditions to be considered 'final' under the APA.  First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."

*Parsons v. DOJ*, 878 F.3d 162, 167 (6th Cir. 2017) (citations and quotation marks omitted). To satisfy the second of those conditions, the "[l]egal consequences" imposed by an agency action "must be 'direct and appreciable,'" such as giving rise to "criminal or civil liability." *Id.*

Whether or not the Surgeon General's Advisory or Request for Information could be considered the "consummation" of an agency "decisionmaking process," they plainly are not actions that determine legal "rights or obligations" or impose "legal consequences," *id.* As discussed above, they impose no obligations—and noncompliance with them imposes no consequences—at all. An agency action that "does not require anyone to do anything" cannot "have direct and appreciable legal consequences." *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019).

Plaintiffs' contrary argument is difficult to discern. In two sentences (Br. 49), plaintiffs seem to suggest that the actions in question are final because they violated "[p]laintiffs' constitutional rights." But an assertion that these two specific actions, without more, violated the First Amendment would be even weaker than the meritless First Amendment claim that plaintiffs have actually pleaded, and plaintiffs do not appear to offer any basis on which the APA claim could proceed independent of the First Amendment theory.

3. Finally, plaintiffs' Fourth Amendment claim is meritless. The premise of plaintiffs' claim appears to be that they "have a reasonable expectation of privacy" in the "digital records" they have "given to" Twitter, and that the disclosure of those

records in response to the Surgeon General's Request for Information—which plaintiffs characterize as a "search"—would violate the Fourth Amendment.  Br. 47.  But "the obtaining of information is not alone a search unless it is achieved by … a trespass or invasion of privacy," *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012), as opposed to the voluntary request at issue here.

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney*
  *General*

KENNETH L. PARKER
  *United States Attorney*

DANIEL TENNY

 */s/ Daniel Winik*
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*
  *Daniel.L.Winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,026 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Garamond, a proportionally spaced typeface.

/s/ *Daniel Winik*
Daniel Winik

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 28(b)(1)(A)(i), the government designates the following district court documents as relevant:

| Record Entry | Description | Page ID # Range |
|---|---|---|
| RE1 | Complaint, with attachments | 1-65 |
| RE9 | Motion for Preliminary Injunction, with attachments | 78-111 |
| RE31 | Opposition to Motion for Preliminary Injunction and Memorandum in Support of Motion to Dismiss | 186-234 |
| RE33 | Reply in Support of Motion for Preliminary Injunction and Opposition to Motion to Dismiss, with attachments | 243-333 |
| RE35 | Reply in Support of Motion to Dismiss | 335-367 |
| RE37 | Opinion and Order Granting Motion to Dismiss | 369-405 |
| RE38 | Judgment | 406 |
| RE40 | Motion for Leave to Amend Complaint, with attachments | 489-643 |
| RE41 | Order Denying Motion for Leave to Amend Complaint | 644-645 |
| RE42 | Motion to Reopen Case, with attachment | 646-689 |
| RE43 | Notice of Appeal | 690 |
| RE48 | Opposition to Motion to Reopen Case | 700-710 |
| RE49 | Reply in Support of Motion to Reopen Case | 711-718 |
| RE50 | Motion for Leave to Supplement Motion to Reopen Case | 719-723 |

| RE51 | Opposition to Motion for Leave to Supplement Motion to Reopen Case | 724-732 |
| RE52 | Opinion and Order Denying Motion to Reopen Case and Motion for Leave to Supplement Motion to Reopen Case | 733-734 |